# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Elaine E. Bucklo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 2586 | **DATE** | 3/25/2002 |
| **CASE TITLE** | Minch, et al. vs. City of Chicago | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 4/26/02 at 10:00 a.m.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Enter Memorandum Opinion and Order denying defendant's motion to dismiss (7-1) as to the ADEA claims of the plaintiffs. The motion is also denied as to the due process claims of the firefighter plaintiffs. The motion is granted as to the due process claims of Drnek and Cosentino. At the status hearing the court will set discovery and trial schedules in this case. Prior to the status hearing, the parties shall confer and provide the court with a proposed written discovery schedule. Any motion for summary judgment must be filed within 14 days after the date set in the scheduling order for close of discovery. Any extension of discovery will not extend the time for filing motions for summary judgment.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | MAR 2 6 2002 | 34 |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | [signature] | |
| | Mail AO 450 form. | | 3/25/2002 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| MPJ | courtroom deputy's initials | Date/time received in central Clerk's Office | MPJ6 mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
MAR 2 6 2002

DONALD DRNEK,                          )
                    Plaintiff,         )
                                       )
        v.                             )
                                       )   No.  01 C 0840
CITY OF CHICAGO, an Illinois           )
Municipal Corporation,                 )
                                       )
                    Defendant.         )

JAMES D. MINCH, RICHARD A.             )
GRAF, and RICHARD COSENTINO,           )
individually, and on behalf of         )
a class of all individuals who         )
are similarly situated,                )
                                       )
                    Plaintiffs,        )   No.  01 C 2586
                                       )
        v.                             )
                                       )
CITY OF CHICAGO, an Illinois           )
Municipal Corporation,                 )
                                       )
                    Defendant.         )

<u>MEMORANDUM OPINION AND ORDER</u>

The plaintiffs in these cases are Chicago Police and Fire Department officers who were involuntarily retired under the City of Chicago's mandatory retirement ordinance, Chicago Municipal Code § 2-152-140. Donald Drnek sued the City of Chicago ("City") for violations of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"), and for due process violations under federal and Illinois law. James Minch, Richard Graf and Richard Cosentino filed a substantially identical claim on behalf of

34

themselves and others similarly situated.[1] The City moves to dismiss both complaints. I deny the motions as to the ADEA claims in Count I, and grant them in part and deny them in part as to the due process claims in Counts II and III.

## I.

The plaintiffs, all former Chicago police officers and firefighters, were terminated on December 31, 2000, pursuant to the City's mandatory retirement ordinance (the "Ordinance"), which establishes sixty-three years as the maximum age for sworn members of the Police Department and for members of the uniformed service of the Fire Department. Chicago Municipal Code ("CMC") § 2-152-140.[2] The City did not give the plaintiffs an opportunity to take physical fitness tests to demonstrate that they could still meet the fitness requirements of the job.

Ordinarily, under Fed. R. Civ. P. 23, class certification should be addressed before any consideration of the merits, but the ADEA class action is not subject to Rule 23, *see* 29 U.S.C. § 626(b) (incorporating opt-in procedures under 29 U.S.C. § 216); *Tice v. American Airlines, Inc.*, 162 F.3d 966, 973 (7th Cir. 1998) (holding

---

[1] The putative class action was originally filed before Judge Norgle, but was reassigned to me based on relatedness. *See* Minute Order of 5/18/01.

[2] I may take judicial notice of municipal ordinances on a motion to dismiss without converting the motion to one for summary judgment. *See Menominee Indian Tribe of Wisc. v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998); *Newcomb v. Brennan*, 558 F.2d 825, 829 (7th Cir. 1977).

that ADEA class actions are "opt-in" actions under § 216(b), not "opt-out" actions subject to Rule 23), so I may address the merits of these claims without resolving class certification. *See Vanskike v. Peters*, 974 F.2d 806, 812-13 (7th Cir. 1992) (addressing merits of § 216(b) action before resolving class issues); *see also McCann v. City of Chicago*, No. 89 C 2879, 1990 WL 70415, at *3 (N.D. Ill. May 3, 1990) (Grady, J.). On the due process claims, the plaintiffs have not moved for certification under Rule 23, and the City moved to dismiss on the merits without addressing the propriety of certification, so it has waived the Rule 23(c) protection of certification before a decision on the merits. *See Williams v. Lane*, 129 F.R.D. 636, 647 (N.D. Ill. 1990) (Shadur, J.) (Noting that certification prior to the merits protects against "one-way intervention" by class members, and holding that a defendant implicitly waived objection on this basis by seeking a favorable decision on the merits). To the extent that the City objects to the plaintiffs' standing to raise arguments on behalf of other class members, the class issues are not ripe. I therefore address only the claims of the individual plaintiffs.

On a motion to dismiss, I take all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiffs. *Szumny v. American Gen. Fin., Inc.*, 246 F.3d 1065, 1067 (7th Cir. 2001). I will not dismiss a complaint for failure to state a claim unless it appears beyond

doubt that the plaintiffs can prove no set of facts in support of their claims which would entitle them to relief. *Id.*

## II.  Age Discrimination

The ADEA makes unlawful the discharge of an individual because of his age, 29 U.S.C. § 623(a)(1), but it contains an exemption for firefighters and law enforcement officers, *id.* at § 623(j). The exemption applies if certain age requirements are met and if the employment action is taken pursuant to a bona fide retirement plan that is not a subterfuge to evade the purposes of the ADEA. To avoid dismissal, therefore, the plaintiffs need only demonstrate that they are entitled to proceed on one of the two theories: the propriety of the age requirements or subterfuge.

The ADEA was enacted in 1967, and at that time it did not apply to employees of state or local government. *Kopec v. City of Elmhurst*, 193 F.3d 894, 896 (7th Cir. 1999). On March 2, 1983, the Supreme Court held that the ADEA could be applied to state and local government, *see EEOC v. Wyoming*, 460 U.S. 226 (1983), leaving many state and local laws establishing maximum hiring and retirement ages for firefighters and police officers open to challenge. *See Kopec*, 193 F.3d at 897. To preserve mandatory retirement ordinances, states and municipalities had to demonstrate that they fit into the narrow exception for bona fide occupational qualifications ("BFOQ"). *Id.* In 1986, however, Congress amended § 623 to allow states to enforce any age restrictions that were in

place as of March 3, 1983 (the day after the Supreme Court decided *EEOC v. Wyoming*). *Id.* The amendment had a sunset provision, providing for expiration on December 31, 1993. *Id.* The amendment expired, and Congress took no further action until 1996, when it retroactively reinstated the 1986 amendment with some modifications.

The 1996 amendments[3] say that a mandatory retirement provision does not violate the ADEA if "the employer has complied with section 3(d)(2) of the Age Discrimination in Employment Amendments of 1996 if the individual was discharged after the date described in such section." 29 U.S.C. § 623(j)(1). In addition, the employee must have reached either (A) the retirement age in effect on March 3, 1983, or, (B) if the law was enacted after September 30, 1996,

---

[3] The complete text of § 623(j) follows:

(j) Employment as firefighter or law enforcement officer

It shall not be unlawful for an employer which is a State, a political subdivision of a State, an agency or instrumentality of a State or a political subdivision of a State, or an interstate agency to fail or refuse to hire or to discharge any individual because of such individual's age if such action is taken--

  (1) with respect to the employment of an individual as a firefighter or as a law enforcement officer, the employer has complied with section 3(d)(2) of the Age Discrimination in Employment Amendments of 1996 if the individual was discharged after the date described in such section, and the individual has attained--

    (A) the age of hiring or retirement, respectively, in effect under applicable State or local law on March 3, 1983; or

    (B)(i) if the individual was not hired, the age of hiring in effect on the date of such failure or refusal to hire under applicable State or local law enacted after September 30, 1996; or

      (ii) if applicable State or local law was enacted after September 30, 1996, and the individual was discharged, the higher of--

        (I) the age of retirement in effect on the date of such discharge under such law; and

        (II) age 55; and

  (2) pursuant to a bona fide hiring or retirement plan that is not a subterfuge to evade the purposes of this chapter.

the higher of the age provided in the law and age fifty-five. *Id.*
Finally, the employment action must be taken "pursuant to a bona
fide hiring or retirement plan that is not a subterfuge to evade
the purposes of [the ADEA]." *Id.* at (j)(2).

"Section 3(d)(2)" is not a part of the United States Code, but
according to the Historical and Statutory Notes to § 623, section
3(d)(2) "probably means" Pub. L. 104-208, Title I, § 101(a), which
sets forth a "Study and Guidelines for Performance Test" to be
conducted by the Secretary of Health and Human Services ("HHS").
Under Pub. L. 104-208, HHS was to develop and issue, by September
30, 2000, "advisory guidelines for the administration and use of
physical and mental fitness tests to measure the ability and
competence of law enforcement officers and firefighters to perform
the requirements of the[ir] jobs." *Id.* at (c). After issuing the
advisory guidelines, HHS was directed to issue regulations
identifying appropriate nondiscriminatory job performance tests,
*id.* at (d)(1), and "[e]ffective on the date of the regulations
described in [subparagraph (d)(1)], any employer seeking such
exemption with respect to a firefighter or law enforcement officer
who has attained such age shall provide to each firefighter or law
enforcement officer who has attained such age an annual opportunity
to demonstrate physical and mental fitness by passing a test
described in [subparagraph (d)(1)], in order to continue

employment." *Id.* at (d)(2). HHS never issued the advisory guidelines or regulations called for by § 3(c) and (d).

The City had a mandatory retirement ordinance as early as 1939, which provided for retirement of "policemen and firemen in the classified civil service." Pl's Ex. B. This version was in effect until 1983, when the Supreme Court decided that the ADEA applied to State and local governments. *EEOC v. Wyoming*, 460 U.S. 226 (1983). In response to the Supreme Court's decision, the City amended its mandatory retirement ordinance, raising the retirement age to 70 and applying to the "career service," which had replaced the classified civil service in 1976. Pl's Ex. C. This version was in effect until 1988, when the City again amended the ordinance in response to the first "public safety exemption" passed by Congress in 1986. The 1988 version provided that "[e]very sworn member of the police department and every member of the uniformed service of the fire department who has attained the age of 63 years prior to December 31, 1993, shall forthwith and immediately be retired from service." Pl's Ex. D. The ordinance thus mirrored the sunset provision of the 1986 public safety exemption. After December 31, 1993, there was no ordinance that provided for mandatory retirement of police and firefighters until, on May 17, 2000, the City enacted the Ordinance that is the subject of this suit, which sets sixty-three as the maximum age for employment of sworn members of the

Police Department and for any member of the uniformed service of the Fire Department. CMC § 2-152-410(a), (b).

## A. Section 623(j)(1):  Proper Age Requirements

### 1. Fitness Tests

The plaintiffs claim that the City violated the ADEA because it discharged them under the Ordinance without affording them an opportunity to prove their fitness for duty by taking the tests described in § 3(d)(2). Although no such tests were ever prescribed by HHS, the plaintiffs claim that the reference to § 3(d)(2) in § 623(j)(1) made performance testing a "first-tier prerequisite to mandatory retirement," and that "the spirit and the letter of Section 623(j)" require an opportunity to prove fitness before mandatory retirement. The plaintiffs cite *Gately v. Massachusetts*, No. CIV. A. 92-13018-MA, 1998 WL 518179 (D. Mass. June 8, 1998), in support of their argument that the City, like the defendants in *Gately*, ought to have retained an expert to develop tests in order to comply with the statute. But *Gately* was brought under § 623(f)(1) (the BFOQ provision), before the 1996 amendments, so the discussion of § 623(j)(1) as a Congressional endorsement of fitness tests is dictum. I cannot read *Gately*, a case arising under § 623(f)(1), to *require* employers to incur the cost of developing fitness tests to comply with § 623(j), particularly where Congress evidenced an intent in § 3(d)(2) to place that burden on HHS.

Before the expiration of the time for HHS to issue testing regulations, a court in this district examined a mandatory retirement ordinance that provided for the discharge of police officers at age sixty-five "unless 'otherwise demonstrating physical and mental fitness pursuant to regulations to be promulgated by the United States Secretary of Health and Human Services.'" *See Glennon v. Village of S. Barrington*, No. 00 C 1264, 2000 WL 1230494, at *4 (N.D. Ill. Aug. 25, 2000) (Leinenweber, J.). The municipality had not afforded the plaintiff an opportunity to demonstrate his fitness, but the court held that the plaintiff failed to state a claim for a violation of the ADEA on that basis. *Id.* The plaintiff argued that the exemption was void because § (3)(d)(1) states that employers "shall" use performance tests developed by HHS, but "Congress . . . promulgated § 623 without specific fitness tests to go immediately into effect." *Id.* at *4. The court assumed that § 623 was valid because the Seventh Circuit had analyzed several cases under that section and had not questioned its validity. *Id. Glennon* was decided prior to September 30, 2000, so it does not address the situation of what happens when HHS fails altogether to fulfill its mandate under § 3(d)(2). As far as I can tell, this is an issue of first impression.

Section 623(j)(1), as amended, contains no sunset provision, but it leaves a gap by requiring employers to comply with regulations that have not been promulgated. As a "general rule[,]

9

exceptions to remedial statutes are to be narrowly construed." *EEOC v. Chicago Club*, 86 F.3d 1423, 1433 (7th Cir. 1996). The plain language of the statute, the starting point in all statutory interpretation, *United States v. Wagner*, 29 F.3d 264, 266 (7th Cir. 1994), merely mandates compliance with § 3(d)(2), so it offers no guidance in discerning Congress' intent. Section 3(d)(2), however, requires an employer to offer a fitness test developed by HHS "[e]ffective on the date of issuance of the [HHS] regulation," and requires an employer to offer tests only after HHS develops them and issues regulations. Section 3(d)(1) says that an employer "shall" use the performance tests developed and issued by the Secretary. One interpretation of § 623, the one rejected in *Glennon*, is that the exemption was void *ab initio* because it required compliance with non-existent regulations. Put another way, § 623(j) says that an employer may discriminate based on age only if it complies with regulations promulgated by HHS, and if no regulations were promulgated, the employer could not comply and therefore could not meet the requirements of the public safety exemption. An alternative construction is that the fitness tests themselves were an exception to the exemption, with which the City had to comply only once regulations were promulgated. That is, because no regulations were ever promulgated, the effective date in § 3(d)(2) from which employers had to offer fitness tests never occurred, so the City was not in violation of § 3(d)(2) when it

10

failed to offer fitness tests. Because the plain language of § 623 is ambiguous, I turn to the legislative history of the exemption to discern Congress' intent. *See Central States, S.E. and S.W. Areas Pension Fund v. Robinson Cartage Co.*, 55 F.3d 1318, 1323 (7th Cir. 1995).

The so-called "public safety exemption," H.R. 849,[4] was introduced in the House of Representatives on February 7, 1995. 141 Cong. Rec. 3979. Representative Fawell, the sponsor, stated that, although age requirements as job qualifications are rarely justified, the "public safety arena" presents an exception, and he discussed testimony showing that existing physical tests were inadequate to ensure a fit and qualified workforce. *Id.* at 3982.

---

[4] An identical version had twice passed in the House but failed in the Senate. The House Report on one of the earlier bills stated that the purpose of the amendment was to permit, but not require, the use of mandatory retirement ages for State and local firefighters and police officers. H.R. Rep. 103-314, 1993 WL 444307 (1993). At the conclusion of its explanation, the report stated that:

> the Committee is opposed to the expiration of the public safety exception to the ADEA and effectively mandating that States and localities adopt physical and mental fitness tests as an alternative to age-based hiring and retirement policies. States and localities may choose to develop such tests and H.R. 2272 allows them to do this. However, given the paucity of knowledge about appropriate performance standards and the great uncertainty about the effectiveness and legality of one or another performance test, Congress should not force every public safety agency to use such tests.
>
> In making the public safety exception to the ADEA permanent, the Committee does not intend to forever close the door on this issue but rather to ensure that when Congress does re-examine this issue, it does so because there [is] . . . significant evidence of reasonable, effective alternatives to age-based policies that do not have an adverse impact on women and minorities.

*Id.* Thus, the Committee intended that the public safety exemption should apply, without a sunset provision, until a more satisfactory testing alternative became available.

During the floor debates the following month, Representative Fawell stated that the bill directed a federal agency to develop advisory guidelines for fitness tests, but he said "[u]ntil the point that adequate tests are in place however, I feel that the public safety exemption to the ADEA is necessary and that H.R. 849 should be quickly enacted." 141 Cong. Rec. 9491. Representative Owens supported the bill, and said that it "would permanently exempt state and local public safety agencies from the Age Discrimination in Employment Act in order to permit them to consider age in their hiring and retirement policies." *Id.* He also noted that fitness tests in existence at that time tended to discriminate against women and minorities, and that they were not an effective substitute for age limits. *Id.* at 9492. Representative Weldon said that "[f]itness tests are not a valid alternative to age limits," apparently because of the shortcomings of existing tests, and that "[i]n the absence of a valid fitness test, age limits ensure our public safety teams are in peak condition." *Id.* H.R. 849 passed the House on March 28, 1995. *Id.*

An identical bill, S. 553, was introduced in the Senate on March 14, 1995, by Senator Moseley-Braun. 141 Cong. Rec. 7765. Senator Moseley-Braun emphasized that federal public safety officers were subject to mandatory retirement based on age, and that the amendment would extend a similar exemption to State and local governments. *Id.* She recounted the history of the exemption

12

and noted that the EEOC had failed to fulfill its mandate under the 1986 amendment to develop advisory guidelines and fitness tests. She noted that medical evidence demonstrated that age directly affects an individual's ability to perform the duties of public safety officers. *Id.* at 7766. She also said "you may ask why State and local governments cannot just develop tests to screen out those individuals who may still retain their strength at the age of 60 or 70. However, there is no adequate test that can simulate the conditions that firefighters and police officers face in the line of duty." *Id.*

S. 553 was subsumed by the Omnibus Consolidated Appropriations Act for 1997. During the floor debates on September 30, 1996, Senator Jeffords opposed the amendment and denied that existing tests were inadequate to measure fitness for public safety positions. 142 Cong. Rec. 26658. Senator Moseley-Braun again spoke in favor of the amendment, and again addressed the insufficiency of existing tests as a substitute for mandatory retirement ages. *Id.* at 26722. She noted that the amendment provided for a study of appropriate fitness tests, and said that "[t]he provision also includes an exception to the exemption whereby [the National Institutes of Occupational Safety and Health, an agency of HHS] will identify valid job performance tests and public safety agencies utilizing mandatory retirement ages will provide public safety officers who have reached retirement age with an annual

13

opportunity to demonstrate their fitness using the [HHS] tests."
*Id.* The Omnibus Act, including the amendment to § 623(j), passed on
September 30, 1996. Pub. L. 104-208.

The legislative history points toward the second
interpretation: that § 623(j) reinstated the public safety
exemption from 1986 allowing mandatory age-based retirement,
without a sunset provision, but subject to the use of fitness tests
*when and if* suitable tests were ever made available by HHS. The
supporters expressed skepticism about existing fitness tests, and
proposed mandatory retirement as an alternative. Although several
legislators noted that the EEOC had failed to comply with the
mandate of the 1986 amendments to develop tests, none of the them
indicated that the 1996 exemption would expire if HHS failed to
fulfill its mandate, and at least one referred to the amendment as
"permanent." Thus I conclude that § 623(j) permits the City to
enact a mandatory retirement ordinance without offering fitness
tests if HHS has not developed appropriate tests.

The plaintiffs argue that this interpretation produces an
absurd result that frustrates the purpose of the statute and
ignores Congressional endorsement of fitness tests. However, the
legislative history suggests that the intent of the amendment was
to reinstate an exemption from the ADEA allowing for age-based
retirement for public safety officials because fitness tests were
unreliable, expensive, and had potential discriminatory effects on

14

women and minorities. The provision in § 623(j)(1) for compliance with § 3(d)(2) merely imposed an obligation on employers to provide tests when and if suitable tests became available; it did not make tests a condition precedent to the operation of the exemption. Because HHS has not promulgated the regulations called for by the statute, the City could not violate § 623(j)(1) by failing to provide fitness tests before enforcing the Ordinance.

### 2. Timing and Scope

The 2000 Ordinance covers all "sworn members" of the police department and all members of the "uniformed service" of the fire department, a broader class than the members of the "career service" covered by the ordinance in effect in 1983. The plaintiffs have argued, as support for their allegations of subterfuge, *see* below, that the City impermissibly broadened the scope of the Ordinance beyond its coverage as of March 3, 1983, in violation of § 623(j)(1)(A). *See Roche v. City of Chicago*, 24 F.3d 882, 884 (7th Cir. 1994) (holding that, where plaintiff was in class of employees not covered by ordinance in effect on March 3, 1983, § 623(j) exemption was unavailable). However, *Roche* was decided before the 1996 amendments, which permitted mandatory retirement ordinances enacted after September 30, 1996, as long as the age was not lower than fifty-five. *See* § 623(j)(1)(B). The complaint alleges that the Ordinance was enacted on May 17, 2000, and establishes a retirement date of sixty-three. The plaintiffs argue in their surreply that

15

the Ordinance is subject to the March 3, 1983, restriction in §
623(j)(1)(A) because it contains the same age that existed in the
mandatory retirement provision in effect on that date. But §
623(j)(1)(B)(ii) provides an alternative[5] "if applicable State or
local law was enacted after September 30, 1996," in which case
discharge is lawful if the officer has reached the higher of the
age in effect under the new law or 55. Notably, § 623(j)(1)(B)(ii)
does not refer to the enactment of a new "age," it says a new
"law." The plaintiffs consistently argue that the 2000 Ordinance is
different from earlier versions because the scope of coverage is
broader. By the plain language of the statute, it is a new law that
was enacted after 1996, so it falls within the requirements of §
623(j)(1)(B)(ii), and sixty-three was the age in effect in 1983,
*id.* at (j)(1)(B)(ii)(I), so there is no violation based on the
broader scope of coverage.

B. Section 623(j)(2): Subterfuge

The plaintiffs argue that the interpretation of § 623(j)(1)
given above, allowing municipalities to broaden the scope of
mandatory retirement ordinances by enacting new law, renders the
"subterfuge" prohibition meaningless, but it is consistent with the
statutory scheme if subterfuge means something more than a
violation of the age limitations in (j)(1), and I hold that it

---

[5] Section (j)(1) refers to attainment of the age in subsection
(A) "or" (B).

16

does. Section 623(j) requires that mandatory retirement of public safety officials meet the requirements of subsection (1) *and* that it be "pursuant to a bona fide hiring or retirement plan that is not a subterfuge to evade the purposes of this chapter." § 623(j)(2). "[T]he term 'subterfuge' must be given its ordinary meaning as 'a scheme, plan, strategem, or artifice of evasion.'" *Public Employees Retirement Sys. of Ohio v. Betts*, 492 U.S. 158, 167 (1989).

In *Kopec v. City of Elmhurst*, 193 F.3d 894 (7th Cir. 1999), a case involving an age-based hiring criterion, the court noted that, "[t]o the extent that a hiring plan includes a maximum age of hire, what little case law there is on the subject suggests that the plan will not be considered a 'subterfuge to evade the purposes of [the] Act' so long as the age criterion pre-dates the ADEA (or its extension to the employees of state and local governments)." *Id.* at 901. The City argues that *Kopec* is controlling, and that the Ordinance is presumptively not a subterfuge because it provides for the same age of mandatory retirement as all previous versions of the City's mandatory retirement ordinance, including those that predate the ADEA. This position might seem to find some support in *Kopec*, but not when that opinion is read in its entirety.

After making the observation quoted above, the court in *Kopec* went on to consider the question of subterfuge separately from the age requirements in § (j)(1). There the only question presented on

17

the issue of subterfuge was whether the challenged hiring plan qualified for the exception without "proof that the maximum hiring age amounts to a BFOQ, that is, a requirement 'reasonably necessary to the normal operation' of the city's police force." *Id.* The Seventh Circuit rejected this argument as a matter of law because that reading would collapse the exemption in § (j)(1) into the BFOQ exception in § (f). *Id.* at 902. The Seventh Circuit was not presented with any evidence of subterfuge, so the court affirmed the grant of summary judgment against the plaintiff. Likewise, in *McCann*, on which the City relies, the court dismissed the subterfuge claim because the plaintiffs failed to "allege any facts to support a conclusion that the City amended its ordinance with the intent to circumvent the ADEA." 1990 WL 70145 at *4.

The Ordinance, on its face, states that its purpose is public safety, Pl's Ex. A, and the City argues that any inquiry into subterfuge should end here. However, the plaintiffs allege that the purpose of the Ordinance was not public safety; they claim that, in fact, the "Ordinance was enacted for the purpose of eliminating from the ranks of the Police [and Fire] Department[s] . . . officers who had surpassed 63 years of age so that, among other reasons, the City could promote younger police [and fire] officers within its . . . Department[s]." Drnek Compl. ¶ 17; *see also* Minch Compl. ¶ 23. At oral argument on March 8, 2000, the plaintiffs made additional factual allegations that the City's true purpose was to

"make room for young people coming in" to the police and fire departments, citing public statements by the Ordinance's sponsor and by high-ranking City officials.[6]

The City objects that inquiry into the state of mind of the individual aldermen or City officials is irrelevant and immaterial, citing *Pacific Gas Elec. Co. v. State Energy Resources Conservation & Devel. Comm'n*, 461 U.S. 190 (1983), in which the Supreme Court noted, in the context of preemption, that it would "not become embroiled in attempting to ascertain [the state legislature's] true motive." *Id.* at 216. The Court gave two reasons: first, that "inquiry into legislative motive is often an unsatisfactory venture." *Id.* Here the question of whether the Ordinance is indeed a subterfuge is one, ultimately, for the trier of fact, *EEOC v. Home Ins. Co.*, 672 F.2d 252, 262 (2d Cir. 1982), and it is not for me to determine whether an inquiry into the City Council's motives would be an unsatisfactory venture or a revealing expedition. *See Smith v. Cash Store Mgmt., Inc.*, 195 F.3d 325, 327 (7th Cir. 1999) (Under Rule 12(b)(6) "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.").

---

[6] I may consider the plaintiffs' additional factual narration without converting this motion to one for summary judgment. *Forseth v. Village of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000).

The Court's second reason for disregarding evidence of the state legislature's "true motive," however, is more to the point. Under the preemption analysis in *Pacific Gas*, federal law preempted any state law that regulated nuclear waste disposal for public safety purposes, but did not preempt state regulation of the same activities "for purposes other than protection against radiation hazards." *Id.* at 210. Thus, the question was only whether there was a conceivable non-safety rationale for the state's legislation, *id.* at 213, and the Court needed to look no further than the state statute's statement of purpose, which gave an economic rationale, *id.* at 216. The Court did not prohibit all inquiry into legislative motive; it held only that it was "pointless" in that case in light of the legal standard. *Id.*[7]

Federal preemption in *Pacific Gas* was a question of law, *id.* at 201, but "subterfuge" under the ADEA is a question of fact, *Home Ins. Co.*, 672 F.2d at 262, and the City's "true motive" matters. In *Betts*, the Supreme Court held that "subterfuge," in the context of

---

[7] The City also cites two equal protection cases in which the court employed rational basis review of legislation. *See Hearne v. Board of Educ. of the City of Chicago*, 185 F.3d 770, 775 (7th Cir. 1999); *Brown v. City of Lake Geneva*, 919 F.2d 1299, 1302 (7th Cir. 1990). In both cases, the court rejected the argument that "legislation that otherwise passes the proper level of scrutiny . . . becomes constitutionally defective because one of the reasons the legislators voted for it was to punish those who opposed them during an election campaign." *Hearne*, 185 F.3d at 775. As in *Pacific Gas*, the legislators' motives were disregarded because they were irrelevant in light of the standard, not because such an inquiry is never permissible.

a pension benefit section of the ADEA, "connotes a specific 'intent to evade a statutory requirement.' The term thus includes a subjective element . . . ." 492 U.S. at 171 (citations omitted). Thus the intent or desire of aldermen or other City officials is both relevant and material. A subterfuge analysis, like a pretext analysis under a traditional *McDonnell Douglas*-style analysis, necessarily requires the trier of fact to look beyond the defendant's statement of purpose or intent to see whether it is just an excuse or an "artifice of evasion" to cover-up otherwise prohibited conduct.

At oral argument, the City said that the inevitable result of mandatory retirement under § 623(j) is that there is more room to hire and promote younger employees. As a factual matter, this may be true, but it does not follow, as the City suggested during oral argument, that "making room" and other "favorable treatment of younger employees is a necessary component of discharge on the basis of age, which is lawful under the ADEA." Replacement of older employees by younger employees solely on the basis of age is precisely the type of discrimination that the ADEA was enacted to prevent. *See generally Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993) (Purpose of ADEA was to protect older employees from "inaccurate and stigmatizing stereotypes" that younger employees perform better.); *see also Home Ins. Co.*, 672 F.2d at 262 ("[E]xplicit appeal to [benefit of] the 'young,'" was sufficient to

21

raise question of fact about defendant's motivation to subvert the purpose of the ADEA). Age-based retirement is tolerated in limited circumstances under § 623(j), but not for the wrong reasons, *i.e.*, not for reasons that are merely a cover-up for the type of ageism prohibited by the ADEA.

The City argues that requiring it to demonstrate that the purpose of the Ordinance is public safety would have the effect of imposing a BFOQ analysis under § 623(j), a result which the Seventh Circuit has forbidden. *See Kopec*, 193 F.3d at 902. This overstates the result. Although it is commonly referred to as the "public safety exemption," § 623(j) does not prescribe the permissible purposes for mandatory retirement ordinances, but it does tell States and municipalities what the impermissible purposes are. It does not matter, therefore, whether age-based mandatory retirement is "reasonably necessary to the normal operation" of the police and fire departments under the BFOQ analysis; what matters is that the City does not use the public safety exemption as a means of achieving goals, such as cleaning house to "give[] young guys the opportunity to get promoted and . . . allow removal of deadbeats in the senior ranks,"[8] that are otherwise prohibited by the ADEA. Unlike the standards applied in *Pacific Gas* and the equal protection cases cited by the City, it is not enough that a

---

[8] This statement, offered by the plaintiffs at oral argument, is attributed to Alderman Beavers, the sponsor of the Ordinance, in a February 2, 2000 article in the *Chicago Tribune*.

permissible motive is conceivable; under § 623(j)(2), the wrong motive is fatal, even if a permissible motive can be imagined.

At oral argument, the plaintiffs provided additional factual narration suggesting that the introduction of the Ordinance was delayed, four years after Congress passed the 1996 amendment, until a close friend of the Mayor retired in 2000 at age 68. In *Kopec*, the Seventh Circuit held that the safe harbor of § 623(j) is available "for *all* States and municipalities that had age limits in place in 1983, not just to those that have chosen to keep restrictions in place in the ensuing years." 193 F.3d 894, 900 (emphasis in original). However, that discussion related only to whether the age requirements in question satisfied the requirements of § 623(j)(1). *Id.* at 900. The plaintiff there did not argue that suspicious timing was evidence of subterfuge, and the court did not address the issue. In fact, suspicious timing of enactment could not have played a role in that case because the city there had not actually reenacted its ordinance at the time of the adverse employment action. *See id.* at 905 (Posner, J., dissenting). Drawing all inferences in favor of the plaintiffs at this juncture, the four-year delay in reenactment and the coincidental retirement of the mayor's friend, if true, could, depending upon what other evidence was presented, warrant an inference that public safety was not a dominant concern for the City.

The plaintiffs also argue that the Ordinance impermissibly expands the scope of its coverage beyond what it was on March 3, 1983 by including a broader class than the members of the "career service" that were covered by the ordinance in effect in 1983. They cite *Roche*, 24 F.3d at 885-86, for the proposition that any ordinance that is broader in scope than the ordinance in effect in 1983 is a subterfuge to evade the ADEA, but *Roche* did not address the question of subterfuge, and, more importantly, it was decided under the 1986 exemption, which did not contain the provision for new laws that is in the 1996 amendment. *See* 29 U.S.C. § 623(j)(1)(B)(ii).[9] I have already held, because the Ordinance is a new law, that its broader scope does not violate § (j)(1)(B)(ii), and the plaintiffs offer no support for the proposition that action consistent with the requirements of the ADEA, by itself, could support an inference of subterfuge.

Finally, the City argues that the Ordinance cannot be read in isolation, and that it is part of an overall system of retirement benefits that is "bona fide" in the sense that it is a legitimate, benefit-paying retirement system, *see Kopec*, 193 F.3d at 901, and that the whole retirement system is not a subterfuge. However, at

---

[9] The plaintiffs also cite *Stewart v. City of Chicago*, No. 92 C 4919, 1994 WL 46672 (N.D. Ill. Feb 14, 1994) (Grady, J.), in support of this proposition, but *Stewart* was also decided under the 1986 amendment, so its implicit holding that a violation of § (j)(1) is evidence of subterfuge, *id.* at *4, even if correct under the earlier statute, is not dispositive here.

24

least one court has rejected the argument that a "bona fide" plan is *ipso facto* "not a subterfuge," because if "bona fide" and "not a subterfuge" meant the same thing, Congress would have had no reason to use both phrases. *Home Ins. Co.*, 672 F.2d at 260; *see also Kopec*, 193 F.3d at 902 (interpreting § 623(j)(2) to require that a hiring plan be both "bona fide *and* not a subterfuge") (emphasis added). Moreover, a "bona fide" hiring or retirement plan is only one "that is genuine and pursuant to which actual hiring [or retirement] decisions are made," *id.* at 901; to say that a bona fide plan cannot be a subterfuge to evade the purposes of the ADEA requires an inference that the only purpose of the ADEA is orderly payment of retirement benefits, and that is clearly not so. *See Home Ins. Co.*, 672 F.2d at 260. Finally, the City's argument fails logically. If the Ordinance is merely part of the overall system of retirement benefits, and the Ordinance is a subterfuge, then it cannot be that the overall system is not also, at least in part, a subterfuge. The plaintiffs state a claim for a violation of the ADEA under the subterfuge provision of § 623(j)(2).

### III. Due Process

To state a Fourteenth Amendment claim for the deprivation of a property interest without due process, the plaintiffs must (1) show that they have a constitutionally protected property

interest,[10] and (2) allege that they were deprived of this interest without due process. *Kim Constr. Co., Inc. v. Board of Trustees of Village of Mundelein*, 14 F.3d 1243, 1245 (7th Cir. 1992). The City originally argued only that there is no property interest, but after the plaintiffs raised the issue in their response, the City argued that the process provided under the plaintiffs' collective bargaining agreements was adequate. However, the cases that it cites stand only for the proposition that due process *may* be satisfied by procedures in collective bargaining agreements. What procedures were provided for under the agreements in this case and whether they were actually available to the plaintiffs are factual questions that must be resolved in favor of the plaintiffs for the purposes of this motion, and the City does not argue that the agreements are facially dispositive of this issue, so dismissal on this ground is not proper. Therefore only the existence of a property interest is at issue here.

"Property interests 'are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . .'" *Ledford v. Sullivan*, 105 F.3d

---

[10] The existence of a liberty or property interest is a threshold requirement for a due process claim under the Illinois Constitution, *East St. Louis Federation of Teachers v. East St. Louis Sch. Dist. No. 189*, 687 N.E.2d 1050, 1060 (Ill. 1997), so the analysis is the same for the state and federal claim.

354, 357 (7th Cir. 1997). "[F]ederal property interests under the 14th Amendment usually arise from rights created by state statutes, state or municipal regulations or ordinances, and contracts with public entities." *Ulichny v. Merton Cmty. Sch. Dist.*, 249 F.3d 686, 700 (7th Cir. 2001). Furthermore, "'property interests subject to procedural due process protection are not limited by a few rigid, technical forms. Rather, property denotes a broad range of interests that are secured by existing rules or understandings.'" *Id.* (citing *Perry v. Sindermann*, 408 U.S. 593, 601 (1972)).

The City attached portions of the police and firefighters' collective bargaining agreements ("CBA") to its motion to dismiss. Both the police and the firefighters CBAs have been ratified by the Chicago City Council, and although they are not codified in the Municipal Code, they are ordinances of which I may take judicial notice under Fed. R. Evid. 201(d), and I may consider them without converting the motion to one for summary judgment. *See Menominee Indian Tribe*, 161 F.3d at 456; *Newcomb*, 558 F.2d at 829.

## A.  Firefighters

Section 16.2B of the firefighter's CBA states that "employees shall be disciplined and discharged only for just cause." Pl.'s Ex. J. The plaintiffs argue that nothing in the firefighters' contract suggests that attaining age sixty-three is cause for termination. Section 13.1 of the CBA also states that the City shall not discriminate against any employee covered by the CBA on the basis

of age, among other things.[11] Pl.'s Ex. J. Article XIX of the CBA states that ratification of the CBA by the City Council commits the City to enact no subsequent ordinances[12] that would impair the enforcement of any of the CBA's terms. *Id.* Furthermore, Illinois law states that "any collective bargaining contract between a public employer and a labor organization executed pursuant to [the Illinois Public Labor Relations] Act shall supersede any contrary statutes, charters, ordinances, rules or regulations relating to wages, hours and conditions of employment and employment relations adopted by the public employer or its agents." 5 ILCS 315/15(b).

Under the CBA, the firefighter plaintiffs had a legally protected interest in continued employment, *see Roman v. United States Postal Serv.*, 821 F.2d 382, 386 (7th Cir. 1987) (finding property interest based on collective bargaining agreement that provided for termination only for "just cause"), and the nondiscrimination provision in the CBA extends that interest to include protection from discharge on the basis of age. For the purposes of this motion, I must take as true the plaintiffs'

---

[11] Section 13.1 states that "[i]n accordance with applicable law, neither the Employer nor the Union shall discriminate against any employee covered by this agreement because of race, creed, color, national origin, sex age, religion or political affiliation."

[12] The Ordinance was enacted on May 17, 2000, subsequent to ratification of the CBA on January 14, 1998.

allegation that they were fired solely because of their age, so they have stated a claim for a deprivation of a property interest.

The plaintiffs' claim to a property right based on the nondiscrimination provision is distinguishable from a mere expectation of fairness. The Seventh Circuit has held that, where a state statute and municipal ordinance guaranteed that civil service promotion examinations would be fair, that guarantee of fairness did not rise to the level of a property interest where there was no underlying entitlement to the promotion itself. *See Bigby v. City of Chicago*, 766 F.2d 1053, 1056-57 (7th Cir. 1985); *see also McMenemy v. City of Rochester*, 241 F.3d 279, 287 (2d Cir. 2001) ("But because [the plaintiff] had no legitimate claim of entitlement to--and therefore no property interest in--the position to which he aspired, the procedures used to fill that job are immaterial to his due process claim."). Here, however, the promise not to discriminate runs to a job in which the firefighter already has an entitlement, and the promise enhances the existing protection in contemplation of naked age discrimination, which is alleged to have occurred here.

In reply, the City points to § 9.1(C) of the CBA, which states that, in addition to a disciplinary termination for "just cause," a firefighter's employment may be terminated when he "[r]etires or *is retired.*" Reply at 25. The City argues that the "retires *or is retired*" language contemplates mandatory retirement, but I must

view the CBA in its entirety; a "contract is to be interpreted from an examination of the complete document and not an isolated part." *Western Cas. & Sur. Co. v. Brochu*, 475 N.E.2d 872, 876 (Ill. 1985). The passive "is retired" language must be read as subject either to the provision for disciplinary discharge for "just cause," or to the nondiscrimination clause, if either of those provisions is to be afforded meaning. *See Leahy Realty Corp. v. American Snack Foods Corp.*, 625 N.E.2d 956, 966 (Ill. 1993) ("Courts should avoid giving an interpretation to a provision that will nullify the clear and unambiguous language of another provision."). Nor is the "in accordance with applicable law" provision in § 13.1 dispositive; I have already concluded that the plaintiffs state a claim for a violation of the ADEA, so they have also stated a claim for a violation of the City's contractual obligation to abide by the law. The firefighter plaintiffs have sufficiently alleged the deprivation of a property interest.

## B. Police

The police CBA also contains a nondiscrimination provision, but that provision contains a limitation: "Nothing in this Agreement shall be deemed to preclude the mandatory retirement of any officer upon or after the attainment of age 63." Ex. M, § 10.2. Unlike the firefighters' CBA, then, the nondiscrimination provision here does not create a property interest in employment after age sixty-three. The plaintiffs do not respond to the City's argument

30

that the CBA does not provide a property interest for police officers age sixty-three or older, but argue only that "there can be no doubt that this provision was intended to be enforced in a lawful manner and without waiving due process." Resp. at 32. There can be no due process violation without a property interest, however, *see Kim Constr. Co.*, 14 F.3d at 1245, and the plaintiffs have not identified any provision of the police CBA that creates such an interest.[13] The plaintiffs argue that "[t]o the extent that the collective bargaining agreements for police officers permitted the City to engage in mandatory retirement, they did not permit the City to use mandatory retirement as a means to engage in arbitrary and capricious age discrimination." Resp. at 32. At best this argument may be construed as saying that both the mandatory retirement ordinance and the police CBA violate the ADEA, but attacking the validity of the CBA does not demonstrate that the intent of the parties to the CBA was to establish a property interest in employment after age sixty-three.

Beyond the CBA, the plaintiffs point to several rules and ordinances, but none of them establishes a protectable property interest in employment after the age of sixty-three. They cite to a district court case about reinstatement for the proposition that

---

[13] For the same reasons, the plaintiffs' claim that a property interest is created by § 2-74-050(1), which provides that career service employees may only be discharged "consistent with the requirements of due process of law," must fail. No process is due if there is no property interest.

certain City personnel rules create a property interest, *see Townsend v. City of Chicago*, No. 87 C 6097, 1988 WL 61162, at *2 (N.D. Ill. June 3, 1988) (Parsons, J.), but they do not identify which specific City rules allegedly create a protected interest here. In any event, the statement in that case that "under these rules all 'permanent' Career Service employees have a property interest in their continued employment" is dictum, because the question there was whether the plaintiff, who had resigned but was placed on a reappointment list had a property interest in prospective employment. *Id.* at *2-3. The case cited by the *Townsend* court for that proposition found the property interest based on a memorandum, and held only that the City rules and ordinances defined the process due. *See Fontano v. City of Chicago*, 820 F.2d 213, 215-16 (7th Cir. 1987).

The plaintiffs argue that the City's nondiscrimination ordinance, CMC § 2-74-080, creates a property interest in employment after age sixty-three because it prohibits discrimination based on age. Unlike the nondiscrimination provision in the firefighter's CBA, which imposes a contractual obligation on the City to obey nondiscrimination laws, the freestanding nondiscrimination ordinance does not come as part of a package of obligations that includes continuing employment. Without a connection to an existing property interest, a promise of nondiscrimination is no more than a mere expectation of fairness.

See *Bigby*, 766 F.2d at 1056-57. Even if the plaintiffs could state a claim for a violation of the nondiscrimination ordinance, that standing alone would not create a property interest.

Moreover, the Chicago Commission on Human Relations ("CCHR") has held that the City's Human Rights Ordinance, CMC § 2-160-030,[14] which forbids age discrimination, is superseded by the mandatory retirement Ordinance. *See In the Matter of Minch et al.*, Nos. 01-E-21/44/48 (CCHR Aug. 24, 2001) (slip op.). It held that, to the extent that the two ordinances conflicted, the mandatory retirement Ordinance, as the more recent and more specific of the two, controlled, and that the only way to read the two ordinances together and give effect to both was to hold that the mandatory retirement Ordinance created an exception to the human rights ordinance. *See id.* at 16. I find this reasoning persuasive, and conclude that because the human rights ordinance has been "amended silently," *id.*, to allow mandatory retirement at age sixty-three, it cannot provide the basis for a property interest.

The same reasoning also applies to the plaintiffs' argument that the municipal code provides procedural protections for discharged police officers. The provision they cite in support of this, CMC § 2-84-030, states that "[n]o officer or employee of the police department in the classified civil service of the city . . . . may be removed or discharged, or suspended . . . except for cause

---

[14] § 2-74-080 incorporates chapter 2-160 by reference.

upon written charges and after an opportunity to be heard in his own defense by the police board." Read together with the more recent and specific mandatory retirement Ordinance, it cannot create a property interest in employment after age sixty-three. Furthermore, the sentence cited by the plaintiffs appears in a paragraph describing the police board's power to conduct disciplinary hearings. Because there is no allegation that any of the plaintiffs were discharged for disciplinary reasons, this section does not apply here.

Finally, the plaintiffs claim that they have a property interest in their pension benefits because the Illinois constitution guarantees that membership in a pension plan is a contractual relationship, "the benefits of which shall not be impaired." Ill. Const. Art. XIII, § 5. Specifically, they claim that any purported class members who have not reached minimum vesting in their pensions ("unvested plaintiffs") have a right not to have their benefits reduced by forfeiture of the City's contribution, and that members of the class whose pensions have reached minimum vesting ("vested plaintiffs") have a right not to have their benefits capped by not receiving future annual raises.[15]

---

[15] Because the class certification issue has not been presented to me, I address only the claims of the individual plaintiffs, but neither party identifies the vesting status of the named plaintiffs, so I address arguments on behalf of both vested and unvested police officers.

34

The claim as to vested plaintiffs has been rejected by the Illinois Supreme Court. *See Peters v. City of Springfield*, 311 N.E.2d 107, 151-52 (Ill. 1974). In *Peters*, the City of Springfield enacted an ordinance lowering the mandatory retirement age from sixty-three to sixty. *Id.* at 108. The plaintiffs, three firemen retired under the ordinance, sued, among other reasons, on the ground that the ordinance interfered with their pension rights in violation of Article XIII, § 5. *Id.* at 111. Under the pension plans, firemen over the age of fifty with twenty or more years of service were entitled upon retirement to a monthly pension equal to fifty percent of their annual salary, subject to annual one percent increases up to a maximum of sixty-five percent. *Id.* The plaintiffs, who were vested respectively at fifty-two percent, fifty-eight percent, and sixty-five percent at the time of their retirement, argued that they had a constitutionally protected right to work until they reached sixty-five percent or age sixty-three, whichever was sooner. *Id.* The court noted that because the pension plan was based on salary and length of service, there were many variables that could affect the amount of the pension, including changes in employment status. *Id.* at 112. The City of Springfield and *amicus curiae* (including the City of Chicago) argued that the right to work until a certain age or until maximum vesting was not a "pension benefit" protected by § 5. The court agreed, and held that § 5 "was not intended, and did not serve, to prevent the

35

defendant City from reducing the maximum retirement age, even though the reduction might affect the pensions which plaintiff would ultimately have received." *Id. Peters* is controlling, so neither § 5 nor Illinois pension laws create a protectable interest in employment beyond the age of mandatory retirement. *See also Booth v. Sims*, 456 S.E.2d 167, 181-82 (W. Va. 1995) ("Although participation in a government pension system and forbearance in seeking other employment create an employee's contract right to pension benefits under [the state constitution], such participation does *not* create contract rights to government employment."). The plaintiffs do not explain why this rule should not also be applied to any unvested plaintiffs, whose entitlement to benefits under the pension laws is weaker, not stronger.

The plaintiffs acknowledge the holding of the Illinois Supreme Court in *Peters*, but argue that it is "not dispositive" of all of their Illinois due process claims, and that it does not "negate decisions of the Seventh Circuit which acknowledge the existence of protect[a]ble 14th amendment Due Process claims with respect to pension benefits." (Citing *Buttitta v. City of Chicago*, 9 F.3d 1198 (7th Cir. 1993)). *Buttitta* involved a plaintiff who had been placed on disability leave, but not terminated, who claimed that the Illinois Pension Code created a property right to demonstrate his fitness for active duty. *Id.* at 1202. The court construed a section of the Pension Code that provided for transfer of an officer on

disability leave between the Pension Board and the Police Department. *See* 40 ILCS 5/156. Noting that "the statute's language is directed primarily toward the prevention of fraudulent disability claims," the court held that "§ 5-156 created in police officers a property interest to the extent that police officers who have been disabled may not be deprived of the opportunity to demonstrate their fitness for active duty." *Id.* at 1204. But § 5-156 does not apply here, because the plaintiffs were not on disability leave, and they have identified no similar provision of the Pension Code that would create such interests in the case of mandatory retirement.

The plaintiffs also cite to *Swick v. City of Chicago*, 11 F.3d 85 (7th Cir. 1993), for the proposition that the court could "imagine a case in which a period of forced inactivity impeded promotional opportunities or had indirect effects on post-retirement income." But those facts were not presented to the Seventh Circuit, so it never reached the question of whether the plaintiff actually had an entitlement to the lost income and opportunities. If it had reached the question, it would have run into *Peters*, where the Illinois Supreme Court held that such an indirect effect was insufficient to trigger the protections of Illinois law regarding pensions, 311 N.E.2d at 112, and it is state law, not federal law, that creates the property rights protected by the Fourteenth Amendment, *see Ledford*, 105 F.3d at 357. The police

plaintiffs have failed to identify a state law that creates an entitlement to due process upon mandatory retirement at age sixty-three, so they cannot state a claim for a deprivation of due process.

## II.

The City's motion to dismiss is DENIED as to the ADEA claims of all of the plaintiffs. The motion is also DENIED as to the due process claims of the firefighter plaintiffs, Minch and Graf. The motion is GRANTED as to the due process claims of the police plaintiffs, Drnek and Cosentino.

**ENTER ORDER:**

_Elaine E. Bucklo_

Elaine E. Bucklo
United States District Judge

Dated:    March 25, 2002